Elizabeth SALZWEDEL, a Minor, by Harry Salzwedel, Her Natural Father and Next Friend, et al., Plaintiffs-Respondents,

v.

William Norman VASSIL; Defendant-Appellant.

No. 8027.

Springfield Court of Appeals.

Missouri.

Nov. 20, 1961.

Wayne Waldo, Waynesville, John J. Alder, of Alder & Morrison, Kansas City, for appellant.

Cohn & Lentz, Waynesville, for respondents.

McDOWELL, Judge.

This is an action for damages for personal injuries arising out of an automobile collision on October 1, 1958, in Pulaski County, Missouri. Plaintiffs obtained a verdict and judgment against defendant in the following amounts: Ellen Salzwedel, $9,500; Elizabeth Salzwedel, a minor (by next friend) $1,000; and Harry Salzwedel $882.00. From this judgment defendant appealed.

The petition was in three counts; Count I on behalf of Elizabeth Salzwedel, a minor, through her next friend; Count II on behalf of Ellen Salzwedel; and Count III on behalf of Harry R. Salzwedel.

On October 1, 1958, about 5:30 P.M., plaintiff, Ellen Salzwedel, was driving her 1955 Chevrolet automobile east on Highway 66, in the right-hand side of a four lane, blacktop divided highway in Pulaski County, when it was struck from the rear by a 1950 Ford car owned and driven by defendant, Sgt. William Norman Vassil. The collision occurred about one mile east of the Fort Leonard Wood turnoff and about 25 or 30 feet west from the entrance to Whispering Pines Trailer Court. The road at the place of collision was level. The weather was clear, the road dry, and there was a visibility of about 600 yards. The lights on plaintiff's car were on. Plaintiff had been traveling at a speed of about 45 or 50 miles per hour until she reached a point about 200 yards from the entrance

to the trailer court when she put on her blinker lights, reduced her speed and looked in the rear view mirror to see if there were any cars coming. She saw car lights a "good piece" back, three or four hundred yards. At the time of the collision plaintiff's car was traveling 25 or 30 miles per hour. When she signaled to turn into the trailer court she just took her foot off the gas and gradually slowed down. Her car was still in motion when defendant's car struck the rear end thereof. She gave this testimony:

"Q. Now, what happened to your automobile after it was struck? A. Well, it was shoved clear past the entrance.

"Q. And after you came to a stop, where was your car located in relation to Highway 66? A. Well, it was still on the highway, but it was past the trailer court where you turn off."

As a result of the impact the trunk of plaintiff's car was pushed in and bumpers bent out of shape. One witness said "* * * the back lid of the trunk was all bent and pushed clear up to the back window, and the whole back end was smashed in. * * * he jarred the car so bad that it broke the seats completely loose inside, * * *". After the collision plaintiff was able to get out of her car and she ascertained that it was Sgt. Norman Vassil who was driving the Ford car that hit her. At time of accident plaintiff's five minor children were in the car with her. They remained at place of accident 30 or 40 minutes until plaintiff's husband came and took them to their home in Waynesville.

Jim Hudson, Missouri State Highway Patrolman, stationed at Rolla, testified that he investigated the collision and made a report. He stated the collision occurred five-tenths of a mile east of the junction of U. S. Highway 66 and Route "Y", near the driveway going into Whispering Pines Trailer Court; that the cars involved in the collision were a 1950 Ford Coach and a 1955 Chevrolet sedan; that William Norman Vassil was driving the Ford, his ad-

dress Company B, 62nd E.B.C., Fort Leonard Wood, Missouri. He stated the Ford was off the pavement across the ditch, parallel with the driveway leading into the court; that the Chevrolet was about 50 feet beyond the driveway on the shoulder of the road (someone had moved the car off the road). Witness stated the road was dry; that he observed debris in the road at scene of collision, back from the driveway leading into Whispering Pines Court; that the debris was dirt and pieces of metal on the drive in the right hand lane of the two-lane highway of eastbound traffic; that the Chevrolet was damaged in the rear end, bumper, trunk lid and side panel; the Ford had the front end damaged. Witness stated he had a conversation with defendant, Vassil, as to how the collision occurred. He gave this evidence:

"Q. What, if anything, did he say in regards to the collision? A. His statement was that 'it seemed to me like another car got in front of me and I couldn't pass it.'

"Q. Now, did you have a chance, while you talked to Mr. Vassil, to observe his talking? A. Yes, sir.

"Q. What did you observe about his talk? A. Vassil appeared to have been drinking, and I asked him about that."

He stated defendant's speech was incoherent, his eyes were somewhat dilated, he was sweating and his breath smelled of alcohol; that defendant stated he had "been drinking several beers".

Witness testified that it was about 500 feet from the top of the hill to the entrance way of Whispering Pines; that the road was downgrade from Fort Wood junction to a point beyond hill crest west. He said you could see west from the entrance to the court along Highway 66, about 500 feet.

Ellen Salzwedel testified that when her car was struck she was "slung forward against the steering wheel and then snapped back real hard, and my neck was jerked backwards and forwards". She testified that after the collision she was dazed, felt scared and all shook up but that she managed to get out of the car. Plaintiff arrived back at her home in Waynesville about 7:00 o'clock. She stated when she got back home "Well, I was awfully nervous and my neck hurt an awfully lot, and the back of my neck and down my back". She went to their family doctor, Dr. Nickels, an Osteopath at Waynesville on October 3, 1958. She said when she reached the doctor's office she felt "awfully dizzy"; that she hardly knew what she was doing all day; that the back of her neck hurt, and her shoulders and down into her arms hurt and her head ached. She said "It was just a sharp pain down my back and dull pain over here in my shoulder (indicating)". The doctor gave her a chiropractic treatment on her neck and pills to relieve her pain and for her nerves. She returned home after the treatment on October 3rd; that it was quite a while before she went back to the doctor for further treatment. She stated she was having trouble with her monthly periods; that she had never had this trouble before and she went back to Dr. Nickels. She gave this testimony:

"Q. Now, * * * How did you feel during this time that you left the doctor's office on October 3rd and the time that you went back to see him again? A. Well, I had headaches pretty often, and my back would hurt if I'd do much work at all."

Witness testified she was just an ordinary housewife; that her duties consisted of sweeping, scrubbing floors, ironing, cooking and taking care of her children; that prior to the accident she could do this work but after the accident she couldn't work as long periods as before, had to stop and rest or lie down, got very nervous and some things she just could not do; that she has to have her children and husband do them. She stated that during this period her neck and shoulders hurt her a great deal, especially when she got tired doing heavy work. She said the pain was in the back of her neck, down her back and shoulders and into her arms; that it was just a dull pain at

the present time. Witness stated she was still going to Dr. Nickels once a week; that he gives her chiropractic treatments on the back of her neck and three places on her back, which treatments were very painful; that he gives her medicine to relieve the pain and for her nerves. She stated that the treatments make her sick for about two or three hours, then she starts feeling better for two or three days when the pain comes back. She said the pain was the same pain she had right after the accident and the doctor continued to give her pills for her nerves and for the pain in her back. She stated she sometimes takes six or eight pills a day; that the doctor said to take two every time she needed them. She testified that prior to the accident she was able to sleep at nights but after the accident there were a lot of nights she was so nervous she could not sleep because of nervousness and the pain in her back; that she had to take Dr. Nickels' medicine to relieve the pain. The evidence is that plaintiff has six children to care for now, one having been born after the accident, to-wit, January 8, 1960. She was 35 years of age. She gave this testimony:

"Q. * * * And what are your complaints at the present time in regards to your health? A. Well, just mostly my neck and back here (indicating) if I do ironing, or anything like that, and my shoulder starts hurting; I get awfully nervous with the children, * * *."

Witness stated she still has headaches and dizziness; that the floor feels like it is tilting in front of her; that this condition happens once or twice a week; that there is never a day she does not have pain in her shoulders. She stated that she still can drive an automobile but can't go on long distance drives as she could before the accident; that if she drives long distances her shoulder and back start hurting and she gets nervous.

Dr. Harvey Nickels, a physician in Waynesville, Missouri, treated Ellen Salzwedel, plaintiff, for injuries allegedly received in the accident. The doctor stated that he had been treating plaintiff on an average of twice a month since the accident; that she complained of severe pain in the neck region, particularly where the neck and the rib posterior or thoracic area joined together, and severe headaches, with tightness of the neck and numbness and tingling down the arms and pain in both shoulders and in the muscle masses along the neck and the back. He gave this answer: "Physical examination of the patient resisted active and passive motion. In other words, she wouldn't move her head in full range of motion, nor neither would she permit me to move her head in full range of motion, and there was a considerable amount of pain, or what appeared to be pain, elicited on these maneuvers, and the neck had— moves to the right and left and backwards and forwards, and all those areas of movement she complained of considerable pain."

As to treatment, the doctor stated: "Well, treatment that was given was conservative tpye of treatment in so much as her activities were restricted, she was placed on pain tablets and muscle—skeletal— muscle relaxation, with a drug that stops the inflammatory reaction in the neck and in those injured areas."

The doctor's diagnosis was whiplash injury or strain or sprain of the cervical spine and thoracic spine, with possible damage to the spinal cord. He testified he took x-rays which did not show any fractures; that he had treated Ellen Salzwedel several times since the first treatment, at least twice a month and sometimes more, all the way from October 3rd until the present time. The treatment given was manipulative therapy with deep massage on the muscles, and injections of cortisone, which is an anti-inflammatory drug, with associated skeleton-muscle relaxing and pain tablets. He also gave her some sedatives because of her inability to sleep. He stated that plaintiff had the same complaints each time she came into his office; that the treatments gave her temporary relief. He testified:

"Q. Now, these injuries, Dr. Nickels, are they permanent? A. I'd say yes."

Dr. Nickels gave it as his opinion that Ellen's trouble with her monthly periods was due to nervousness associated with the accident.

Dr. D. L. Yancey, Orthopedist of Springfield, testified for defendant. He made a neurological test of Ellen Salzwedel and found only subjective symptoms, no nerve injury. His first examination was on March 9, 1959. At that time plaintiff complained of suffering in and around her neck, shoulders and back; that she had headaches and dizziness and, from the history she gave him, the doctor thought her trouble was related to the accident. He made a diagnosis of sprain of supporting muscles and ligaments of the neck. He testified these injuries occurred frequently from rear end automobile collisions. He stated that plaintiff had undoubtedly sustained a strain of the muscles and ligaments of the neck but she appeared to be progressing satisfactorily; that such injuries are somewhat slow in healing but she had no indication of permanent disability. He examined plaintiff again May 17, 1960, and, in his report, stated that she had some permanent disability but that it would be little, if any, as a result of the accident. The doctor stated that plaintiff, at the last examination, still was having discomfort in the neck and muscles; that she had a mild tenderness along the upper border of each trapezoid muscle or large muscle that runs from the neck down to the shoulder area, and there was noted in the lumbo-sacro area of her spine a mild tenderness. This is the area between the pelvis and waist line. He stated there was a mild crepitation noted in each shoulder during manipulation; that this is a grinding sensation in the shoulder joints. The doctor testified that the condition of the trapezius muscle has a relation to the thoracic nerves. It was his opinion that the pain suffered by plaintiff is primarily due to tightness and muscle tenseness brought about after hard work or when the patient becomes tired. He stated that plaintiff complained of numbness in her arms, and, at his last examination he could not detect any change in sensations there. He testified: "If there is certain compression made on a nerve it may produce numbness or a loss of normal sensation". He said "such numbness would come from about the fourth, fifth and sixth cervical nerve in her neck"; that plaintiff complained of her neck injuries and if there is any permanent damage to a nerve you have permanent reflex change and permanent hypesthesia, or "what we call anesthesia numbness. It's possible." The doctor stated the best cure for such trouble is inactivity; that medicine would not have much effect. He said the length of time plaintiff would have to be inactive would be difficult to state; that if she were totally inactive she would not have the pain but the more she shifts the more discomfort she will have. He said her muscles get tired and she probably has some amount of swelling which may produce some change in sensation. He testified that x-rays would not show strain of the neck or of the ligaments of the cervical vertebra or the muscles; that between the two examinations he made there was not much change in plaintiff's strength. The doctor said he could visualize that plaintiff had some degree of permanent disability; that from her condition, as he found by examination, plaintiff should have more intensive neurological examination. He admitted that some cases like plaintiff's have progressive symptoms.

The record shows that on the morning of the trial plaintiffs agreed to reduce their claims to an amount within the liability limits of defendant's insurance policy and to reduce such claims by an amount of $1900.00 paid in settlement of the Robert Salzwedel case, if defendant would reveal the amount of coverage, which he refused to do. This stipulation is in evidence.

The stipulation sets out that this case was identical to the case tried in the Robert Salzwedel case and that defendant's deposition was taken in that case and that the attorneys representing defendant in taking

the deposition are also representing defendant in the instant case. Plaintiffs offered to admit this deposition but it was objected to by the defendant.

In our opinion we will refer to the appellant as defendant and to respondents as plaintiffs, the position occupied by the parties in the lower court.

Under defendant's first allegation of error he complains of the action of the trial court in entering judgment on the jury's verdict in favor of plaintiff, Ellen Salzwedel, for damages for personal injuries because the verdict is excessive, against the law and evidence and is the result of bias, passion and prejudice of the jury.

Defendant admits that this point was not specifically raised in his motion for new trial but seeks relief under the plain errors rule as provided in Supreme Court Rule 79.04, V.A.M.R.

■ The law is well settled that this court may consider plain errors of record even though not specifically raised in the motion for new trial or defectively raised. Supreme Court Rule 79.04, V.A.M.R. However, this rule applies only when the court deems that manifest injustice or miscarriage of justice has resulted therefrom. Kamo Electric Cooperative v. Brooks, Mo.App., 337 S.W.2d 444, 445 [1, 2].

In Knight v. Swift and Company, Mo. Sup., 338 S.W.2d 795, 801, [11, 12] the court states this law: "The substance of appellant's point is that the verdict is so excessive that it demonstrates bias and prejudice or misconduct. If that is true the error cannot properly be corrected by a remittitur. Dye v. St. Louis-San Francisco Ry. Co., 361 Mo. 331, 234 S.W.2d 532."

On page 802 [13–15] of the opinion the court stated: "We have ruled frequently and consistently that the amount of the verdict does not necessarily in and of itself indicate passion and prejudice. Abernathy v. St. Louis-San Francisco Ry. Co., Mo. Sup., 237 S.W.2d 161; Keely v. Arkansas

Motor Freight Lines, Mo.Sup., 278 S.W.2d 765; Osburn v. Kansas City Southern Ry. Co., 360 Mo. 813, 230 S.W.2d 856." Loveless v. Locke Distributing Company, Mo. Sup., 313 S.W.2d 24, 33 [13].

Defendant contends that the circumstances require a new trial not only because of the size of the verdict in comparison to the injuries, but because of the inflammatory appeal to drunkenness presented by counsel for plaintiffs in the evidence and final argument.

■ It has been held, and rightly so, that argument as to intoxication is improper when there is no evidence to support it. Schwinegruber v. St. Louis Public Service Co., Mo.App., 241 S.W.2d 782, 786 [6, 7]; Leaman v. Campbell 66 Express Truck Lines, 355 Mo. 939, 199 S.W.2d 359, 365 [6]. However, in the case at bar, there was ample evidence as to the condition of the defendant which supported the statements made by the counsel for plaintiffs. We find no merit in this contention.

Defendant's next contention under this alleged error is that the verdict of $9,000.00 in favor of plaintiff, Ellen Salzwedel, is excessive and against the weight of the evidence and requires a remittitur of $6,-000.00.

■ In passing upon this alleged error we view the evidence as to plaintiff's injuries from a standpoint favorable to her and ignore defendant's contrary evidence. Morgan v. Thompson, Mo.Sup., 325 S.W.2d 794, 798 [3]; Haferkamp v. City of Rock Hill, Mo.Sup., 316 S.W.2d 620, 624, [1–3]; Riggs v. Metcalf, Mo.Sup., 315 S.W.2d, 791, 796 [6].

■ Excessiveness of verdict is dependent upon the facts of the particular case, and in determining the question consideration is to be given the nature and extent of the injuries and losses, diminished earning capacity, changing economic factors and compensation awarded and approved in cases of similar or fairly comparable in-

juries, and the nature, extent and permanency of the injuries are the paramount factors and the ultimate test of excessiveness or inadequancy. Brown v. Payne, Mo. Sup., 264 S.W.2d 341, 348 [10].

In Greco v. Hendricks, Mo.Sup., 327 S.W. 2d 241, 245, [2, 3], the court stated this law: "The trial court is vested with discretion to order a new trial on the ground of excessiveness and such an order is equivalent to granting a new trial on the ground that the verdict is against the weight of the evidence. We usually do not weigh the evidence on appeal from an order granting a new trial on the ground of excessiveness, but determine only whether there was substantial evidence, viewed in the light most favorable to the trial court's action, to support the trial court's order. "If so, there has been no abuse of discretion and the trial court's action will be sustained. Combs v. Combs, Mo., 295 S.W.2d 78, 80 [1, 2]; Wicker v. Knox, supra, 242 S.W.2d 569 [3, 4]."

■■ We agree with defendant that the law is that there is no precise formula for gauging whether a verdict is excessive but each case depends upon its own facts. The nature, extent and permanency of the injuries are the paramount factors and the ultimate test of excessiveness. The award must be what will fairly and reasonably compensate plaintiff for her injuries. Larson v. Atchison, T. & S. F. Ry. Co., 364 Mo. 344, 261 S.W.2d 111; Marczuk v. St. Louis Public Service Co., 355 Mo. 536, 196 S.W. 2d 1000.

■ The amount of damages for personal injuries is primarily the jury's function and prerogative, and upon appeal, the appellate court pays deference to the trial court's action in seriously considering and passing upon excessiveness or inadequacy of verdicts and is reluctant to disturb judgment or require remittitur. Larson v. Atchison, T. & S. F. Ry. Co., supra, 261 S.W.2d page 116 [5–8]; Lindsey v. Williams, Mo.Sup.,' 260 S.W.2d 472; Mooney v. Terminal R. R. Ass'n, 353 Mo. 1080; 186 S.W.2d 450, 455;·

Schaefer v. Transamerican Freight Lines, Mo.Sup., 173 S.W.2d 20, 24–25.

In the instant case plaintiff, Ellen Salzwedel, was involved in a serious rear end automobile accident. Admittedly, she was in good health prior to the accident but, immediately thereafter, suffered severe pain in her neck, back of her neck and back, together with pain extending over her shoulders and down into her arms causing numbness and headaches. While the evidence is that she did not seek medical aid for two days later, yet, she was suffering from the injuries above mentioned. She had dizziness. This accident happened October 1, 1958, and the pain and suffering diagnosed as a strain of the muscles and ligaments of the neck and in the region of her right shoulder was made by defendant's doctor, Dr. D. L. Yancey from his examination of plaintiff March 9, 1959, and from a further examination made by said doctor May 17, 1960. In the last examination the doctor gave it as his opinion that plaintiff had some permanent disability as a result of the accident and he testified that at that time she was still having the same severe pain in her neck, back, shoulders and arms that she had when he first saw her. There was no improvement. The doctor stated she had a mild tenderness along the upper border of each trapezoid muscle and he found a mild tenderness in the lumbosacral area of her spine; that there was a mild crepitation noted in each shoulder during manipulation. He testified that plaintiff suffered pain primarily due to tightness and muscle tenseness which was brought about by hard work or when the patient became tired. He admitted that plaintiff still had numbness in her arms at his last examination and he had not detected any improvement. He said that certain compression made on a nerve may produce numbness or loss of normal sensation and that such numbness in the arm could come from the fourth, fifth and sixth cervical nerve in her neck. The doctor stated that the best cure for such trouble was inactivity; that medicine would not have much effect.

He said the length of time she would have to be inactive would be difficult to state; that if she remained totally inactive she would not have the pain but the more she shifts the more discomfort she will have; that when her muscles get tired plaintiff probably will have swelling which will produce some change in sensation. He said he could visualize that plaintiff had some degree of permanent disability and from his examination he felt she should have more intensive neurological examination.

Dr. Nickels' diagnosis was "whiplash injury or strain or sprain—the same thing—of the cervical spine and thoracic spine, with possible damage to the spinal cord". He testified he had been treating plaintiff since the accident about twice a month and sometimes more from October 3rd, 1958, until the present time. His treatment was by manipulative therapy with deep massage on the muscles, and injections of cortisone, which is an anti-inflammatory drug, with associated skeleton-muscle relaxing and pain tablets, and sedatives to make plaintiff sleep. He testified that plaintiff's injuries were permanent.

Defendant relies on the opinion in Larson v. Atchison, T. & S. F. Ry. Co., supra, Mo. Sup., 261 S.W.2d 111, as authority for his contention that the judgment in the instant case should be reduced by remittitur of $6,000.00. In the Larson case a postal clerk was injured when a mail pouch struck him in the face. He brought an action against the railroad and recovered a judgment of $15,000.00. The trial court required a remittitur of $5,000.00 and judgment was entered for $10,000.00. On appeal, the railroad claimed the judgment excessive and asked that it be reduced by remittitur. It is unnecessary to set out the evidence of both the plaintiff and the doctors who treated him, but, on page 118 [9], the court stated:

"In this case the plaintiff's sole claim of injury and disability is repeated headaches and a nervous condition manifested by the fact that his memory is not as good as it once was. There is no medical or hospital expense and there was the minimum of medical treatment and none indicated or recommended in the future. This man has never been in a hospital or a clinic. He was injured on the 20th day of January 1951 and returned to his usual work at the regular pay on the 12th day of February 1951 and so far as appears from this record has not missed a day's work since. Except for the first three weeks there has been no loss of wages and no diminished income or earning capacity. Considering the rules indicated and all the factors employed in passing upon the excessiveness of verdicts, including the possibility of error on the part of this court, this verdict is yet excessive in the sum of $4000. McBride v. Clarida, Mo.App., 254 S.W.2d 36; Harvey v. Gardner, 359 Mo. 730, 223 S.W.2d 428; Baker v. Kansas City Ter. Ry. Co., Mo.Sup., 250 S. W.2d 999. If, therefore, the plaintiff will enter a remittitur in the sum of $4,000.00, within fifteen days, the judgment will stand affirmed in the sum of $6,000, as of the date of the judgment, otherwise the judgment will be reversed and the cause remanded for a new trial."

We will not go into all of the authorities cited by defendant. (See authorities cited in Morgan v. Thompson, Mo.Sup., 325 S.W. 2d 794, 799 [4]). These numerous authorities so cited follow the same rule as in the case here set out.

Plaintiff cited Riggs v. Metcalf, Mo.Sup., 315 S.W.2d 791, 796, as having comparable facts to the facts in the instant case.

This was an automobile collision case where plaintiff recovered for personal injuries a judgment of $20,000. The court found, on page 800 [8], that:

"The favorable evidence in Donna's case is sufficient to show that a regularly employed married woman earning $140 per month and certain commissions has sustained serious, permanent and painful injuries which have resulted in 50 to 60 per cent disability of her body as a whole; that the condition is permanent; and that her

injuries have caused degenerative changes in the nerves, which changes are progressive, and her condition will get worse. Under the facts shown we do not find the verdict sufficiently excessive to require any remittitur. We have found no cases closely similar, but compare McCaffery v. St. Louis Public Service Co., 363 Mo. 545, 252 S.W.2d 361, 369 (where the plaintiff had less expectancy and more earnings); and Burr v. Kansas City Public Service Co., 365 Mo. 115, 276 S.W.2d 120, 125 (where the plaintiff sustained less injuries, was much older and had lost no wages."

In the instant case the injuries shown as suffered by plaintiff are in no sense comparable to the injuries suffered by the plaintiff in the Riggs case.

In the case at bar plaintiff's sole claim of injuries and disability is a sprain of the neck muscles, pain in the back of her neck and back, extending down over the shoulders into the arms, together with headaches and a nervous condition. There is no medical or hospital expenses. She never was confined to a hospital. While the evidence does show that she has the same complaints she had after the accident; that she suffers dizziness and pain when she tried to work, yet, she has lost no time from her work. Some things she cannot do as completely as before the accident and she must be assisted by her children and husband, yet, the evidence shows she has been working in the home, driving her car, went to the hospital to see about her daughter, who was confined therein three days after the accident, and that she had been treated by her family doctor, an osteopath, some two times a month since her injury, yet, the evidence shows that after the first treatment it was some time before she went back to the doctor. She complained of injuries to her monthly periods but that condition no longer exists. Considering the rule indicated and all factors employed in passing upon excessiveness of verdicts, this verdict is excessive in the sum of $3,000. If, therefore, plaintiff will enter a remitti-

tur in the sum of $3,000 within fifteen days, judgment will stand affirmed in the sum of $6,000 as of the date of the judgment, otherwise the judgment will be reversed and the cause remanded for a new trial as to damages.

Under alleged error numbered II complaint is made as to the action of the trial court in overruling defendant's pre-trial motions for continuance sought under the Soldiers' and Sailors' Civil Relief Act, 50 U.S.C.A.Appendix, § 501 et seq. and in ordering defendant to proceed to trial in violation of his rights under said Act as a member of the Armed Forces in the military service of the United States, overseas.

To support his position he cites Orrick v. Orrick, Mo.App., 269 S.W.2d 153, 155 [1, 2], where the court stated:

"Since it is, therefore, a matter for the sound discretion of the trial judge to determine under all the circumstances whether, in the particular case, a stay of the proceedings is required by reason of the Soldiers' and Sailors' Civil Relief Act, the ruling of the court on that issue will not be disturbed unless such discretion has been abused. 130 A.L.R., page 784."

This same rule of law is declared in State ex rel. Goehler v. Ladriere, 354 Mo. 515, 189 S.W.2d 986, and Boone v. Lightner, 319 U.S. 561, 63 S.Ct. 1223, 87 L.Ed. 1587, cited by plaintiff.

In the instant case defendant was a soldier located at Fort Leonard Wood. After the accident in question he was sent to Germany. Prior to his going overseas his deposition was taken in an action for damages against him brought by Robert Lee Salzwedel, a minor, by Harry R. Salzwedel, his natural father and next friend, growing out of the same accident that the suits in the instant case grew out of. The same issues as in the instant cases were involved in the Robert Lee Salzwedel case. By stipulation filed by the parties' attorneys in the instant case, it was agreed that the defendant was covered by a liability insur-

ance policy and that the insurance company elected not to disclose the coverage of the policy by so instructing its attorney.

Plaintiffs offered to reduce their claim to come within the limits of the defendant's insurance policy if the coverage would be disclosed, and also to reduce the amount sued for in an additional sum of $1900, the amount paid to Robert Lee Salzwedel for settlement of the suit brought by him.

The deposition of the defendant involving the same issues in the Robert Lee Salzwedel case as in the instant case was taken by plaintiff and defendant was represented by the same attorneys as represent him in the instant case. This deposition was offered in evidence by plaintiffs but objected to by the defendant. The record shows that the action in the instant case was filed August 19, 1959; that service was had on defendant through the Secretary of State, change of venue granted and the cause tried before Special Judge Hon. Claude E. Curtis, June 1, 1960. It further discloses that defendant was refused permission to return to the United States for trial for the reason that he had no time allowance.

 The record discloses that defendant sought by writ of prohibition in the Supreme Court to prevent the trial court from proceeding in this case and the writ was denied. We find that the trial court, under all the circumstances presented, did not abuse his discretion in refusing to grant a continuance or delay of the trial for reason that the defendant was in the armed services of the United States under the Soldiers' and Sailors' Civil Relief Act. This alleged error is denied.

 The third alleged error complains of the giving of verdict-directing instructions Nos. 2 and 3 because said instructions, in the first paragraph, impose a greater burden upon defendant than the law requires.

To support this contention defendant cites Section 304.010 RSMo 1949, V.A.M.S.

This section requires that every person operating a motor vehicle upon the highways of this state shall exercise the highest degree of care.

The first paragraph of instructions 2 and 3 reads: "The court instructs the jury that it is the duty of the driver of an automobile following another automobile to keep a lookout to observe the automobile ahead and its movements, and to keep his automobile under control so that he would not run into the automobile ahead should it slow down, and to keep his automobile a sufficient distance behind the automobile in front of him so as to avoid danger in case of the slowing down of the automobile ahead."

We find that it was held in Gooch v. Avsco, Inc., Mo.Sup., 337 S.W.2d 245, 249 [3, 4] that it is the common law duty of every motorist to keep a lookout ahead and laterally for other vehicles upon the highway to avoid injury and damages to others. Evett v. Corbin, Mo.Sup., 305 S.W.2d 469, 472. That it is the common law duty of a motorist in the rear of another vehicle to operate his vehicle in such a position as to have it under such control as to be able to stop or take other appropriate measure to prevent running into the car ahead of him if the latter comes to a sudden slowing or stop; and that failure of the operator of the vehicle in the rear to exercise the highest degree of care in those respects is negligence. (Citing much authority.)

In the Gooch case, 337 S.W.2d page 251 [6, 7] it was stated: "Plaintiff did not plead the provisions of § 304.017. Instead the case was submitted under the common law duty of an operator of a motor vehicle and in accordance with the common law negligence pleaded in the last amendment made to the petition. It was the prerogative of plaintiff so to do. Brooks v. Mock, Mo., 330 S.W.2d 759, 766 [9, 10]. Statutory rules of the road merely set a minimum rather than a maximum standard of care. They are not preclusive of common law negligence unless the common law negli-

gence pleaded and proved is less in degree than that set forth in their restrictive provision. 60 C.J.S. Motor Vehicles § 268, p. 648. Defendants fail to point out and we have found no portion of the instruction that in any wise conflicts with the standards fixed by these statutes. When the instruction is read in the light of the statutes, it is seen that they are in harmony. The contention is without merit. Jones v. Rash, Mo., 306 S.W.2d 488, 493."

In the instant case plaintiffs' petition alleged common law negligence of the defendant and comes clearly within the law set out in the Gooch case. Plaintiffs state that the reason for the giving of the two instructions is that defendant pleaded in his answer contributory negligence. He did not instruct on contributory negligence and although he did not so instruct, plaintiff, Ellen Salzwedel, and her daughter, Elizabeth, had the duty to exercise the highest degree of care and ordinary care. We find against defendant on this alleged error.

The last alleged error is as to the giving of the verdict-directing instruction No. 4 on damages.

██ Under this contention defendant says it is elementary law that error is committed in an instruction which allows damages not supported by evidence, citing Johnston v. Owings, Mo.App., 254 S.W.2d 993; De Long v. Broadston, Mo.App., 272 S.W.2d 493; and Spears v. St. Louis Public Service Co., Mo.App., 202 S.W.2d 578.

With this law we agree. It is contended by defendant that the evidence contains no description whatsoever of future suffering to the minor, Elizabeth. It is admitted that the verdict in favor of Elizabeth is not excessive, yet, defendant says the instruction may well have been influential in elevating the verdict and judgment in favor of Elizabeth's mother, Ellen, for $9,000, and, for that reason, defendant says he should have a new trial. With this contention we do not agree. The instruction as to Ellen was correct.

Defendant claims no error as to the judgment rendered in favor of Elizabeth, therefore, we think that if error were committed, it would be harmless, especially in view of the fact that defendant offered no corrective instruction.

It is therefore ordered that if plaintiff, Ellen Salzwedel, enter a remittitur in the sum of $3,000 within 15 days this judgment will stand affirmed, otherwise the judgment will be reversed and cause remanded for new trial as to damages for personal injuries on Count II of the petition. So ordered.

STONE, P. J., and RUARK, J., concur.